IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 5, 2019

## STATE OF TENNESSEE v. ROBERT BEHAM

**Appeal from the Criminal Court for Shelby County**
No. 16-00648      Carolyn Wade Blackett, Judge

_____

### No. W2018-01974-CCA-R3-CD

_____

A Shelby County jury convicted the Defendant, Robert Beham, as charged of rape of a child and aggravated sexual battery, and the trial court imposed an effective sentence of forty years at one hundred percent. On appeal, the Defendant argues (1) the trial court erred in denying his motion for judgment of acquittal and the evidence is insufficient to sustain his convictions, and (2) the trial court abused its discretion in applying the enhancement factor regarding his history of criminal behavior. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Rosalind E. Brown (on appeal) and Sam Perkins and James Jones (at trial), Memphis, Tennessee, for the Defendant-Appellant, Robert Beham.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree and Gavin Smith, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

**Trial.** The proof established that G.B. was the mother of the victim, A.W.,[1] and the sister of the Defendant. At the time of the offenses against the victim, G.B. had been dating DeAngelo Westley, who was the father of their two young boys but was not A.W.'s father. In September 2015, G.B., Westley, and the children were living with

_____

[1] It is the policy of this court to identify minor victims by their initials only. We will also identify the minor victims' family members by their initials in order to protect the identity of these victims.

G.B.'s mother, S.B., and the Defendant in an apartment. At the time, A.W. was five years old.

G.B. said that when a person entered S.B.'s apartment, the dining room was on the left, a staircase to the second floor of the unit was directly in front of the door, and the living room was to the right. A person had to walk through the dining room to reach the kitchen, and the kitchen also opened onto the living room. The living room had a small couch with an ottoman, which was usually placed in front of the couch.

The morning of September 7, 2018, G.B. awoke and realized that they had no food for breakfast, so she and Westley left the apartment to purchase milk and cereal at a nearby store. When they left, the three children and the Defendant were playing video games in the living room, and S.B. was asleep in her bedroom upstairs. It took G.B. and Westley approximately five minutes to buy food at the store and return home. They entered the apartment and walked through the dining room to the kitchen so they could prepare breakfast for the family but did not see the children in the living room. G.B. called her children to eat breakfast, and the two youngest children walked into the kitchen from the dining room, but A.W. never came to eat. G.B. began trying to find A.W. She looked in the living room and saw the Defendant "getting up off the floor." She noticed that the Defendant had a surprised look on his face and that his pants were "kind of twisted" like he had just pulled them up. Then she noticed A.W., who did not have her pants on, getting up from the floor with a shocked look on her face "like she was in trouble or something." G.B. observed the Defendant hurrying to get A.W. pants on. She also noticed that the ottoman had been moved from its normal position so that it blocked the view into the living room from the front door.

G.B. asked A.W. why she had not come into the kitchen to eat breakfast and asked the Defendant why A.W.'s pants had been on the floor. The Defendant replied that A.W. had urinated on herself and that he had helped her change her clothes. G.B. took A.W.'s hand and saw that her daughter's underwear was at her ankle even though her pants had been pulled up. G.B. asked the Defendant where A.W.'s wet clothing was, and the Defendant did not answer. G.B. later discovered that A.W.'s underwear had a "streak of discharge" on it, but the underwear did not feel damp as if A.W. had urinated on it, and it did not smell of urine. G.B. said there were no other signs that A.W. had urinated on herself. She noted that A.W. was fully "potty-trained" and did not have a history of urinary problems.

G.B. said she fixed A.W.'s underwear and pants, put A.W. on her hip, and walked out the front door of the apartment with her. When they got outside, G.B. asked A.W. what happened, and A.W. got a "scared look on her face" and "put her head down" before replying that the Defendant had "touched" her. G.B. said that after A.W. told her

what happened, the Defendant, who was standing on the porch, kept yelling, "What did she say?"

G.B. took A.W. with her inside the apartment and told Westley that the Defendant had touched A.W.. She noticed that the Defendant followed them back inside the apartment, where he began "cleaning up and doing things." G.B. went upstairs to awaken S.B., so S.B. could ask the Defendant what he had done to A.W.. She explained to S.B. what A.W. had said to her and informed S.B. that she was calling the police. S.B. undressed A.W. in order to examine her, and G.B. and S.B. observed that A.W.'s genitals were wet and that there was a discharge on A.W.'s underwear. G.B. dressed A.W. without her underwear, which they left on the floor of S.B.'s bedroom, and S.B. went downstairs to talk to the Defendant about what had happened while G.B. called the police.

G.B. said that when S.B. asked the Defendant if he had touched A.W., the Defendant replied, "Man," and "got real[ly] sad" but never denied touching A.W. S.B. seemed "really stunned" and "shocked" and asked the Defendant why he would do that to his niece, and the Defendant got angry and ran up the stairs in order to attack G.B.. G.B. picked up a remote and threw it at the Defendant, hitting him on the top of his nose, which caused him to bleed, and Westley blocked the Defendant from coming up the stairs for G.B.. As the Defendant continued to try to attack G.B., Westley fought him, and they ended up breaking a window as the police arrived. Then the Defendant "picked up a 2 x 4" board, and the police told him they would shoot him if he did not drop it. The Defendant eventually put the board down, and the police arrested him. G.B. told the police what had happened to A.W., and the police questioned everyone in the home, although the Defendant did not say much to the officers.

G.B. briefly talked to the police before riding with A.W. in an ambulance to the hospital. Then G.B. and her family took A.W. to the Rape Crisis Center, where the staff examined A.W. and asked her questions about the incident. G.B. said she was not present during A.W.'s examination or while the staff of the Rape Crisis Center asked A.W. questions. A day or two later, G.B. took A.W. to the Child Advocacy Center, where a forensic interviewer talked to A.W. about what happened. G.B. was not present during A.W.'s forensic interview. She said that she did not talk to A.W. about the details of what the Defendant had done to her before taking her to the Rape Crisis Center or the Child Advocacy Center. G.B. said that following this incident, A.W. had problems "learning and being around people," so she had her go to therapy for a while.

A.W., who was seven years old at the time of the Defendant's trial, testified that the Defendant was her uncle. A.W. stated that she had told the truth about what the Defendant did to her in the forensic interview at the Child Advocacy Center. She also

said she understood the difference between a good touch and a bad touch. A.W. reviewed an illustration of a female figure and identified the vagina as "TT" and the buttocks as "butt." She also reviewed an illustration of a male figure and identified the penis as "TT."

A.W. said that, during the incident, the Defendant took off her pants and underwear. The Defendant touched her "TT" with his hand and then touched her "TT" with his "TT" while his pants and underwear were pulled down. She said that the Defendant's "TT" looked hard when he touched her with it. She also stated that the Defendant put his "TT" inside her "TT" because it hurt. A.W. said that her mother, G.B., came into the room while the Defendant was touching her behind the couch and that the Defendant pulled his pants up and "lied" to G.B. about what he had been doing. She said that after her mother came into the room, she took her outside and asked her what happened, and A.W. told her that the Defendant "was touching on [her]." After this incident, A.W. went to the hospital and the Rape Crisis Center. She also went to the Child Advocacy Center two days later and told the staff there the truth about what the Defendant had done to her. A.W. said the Defendant also touched her "butt" with his "TT," but she could not remember whether that incident occurred on the same day as the other offenses.

DeAngelo Westley testified that in September 2015, he lived in Memphis with G.B., their two sons, A.W., S.B., and the Defendant. Westley said that on the morning of September 7, 2015, he and G.B. left the apartment to buy food for breakfast. When they left, the Defendant and the children were in the living room, and S.B. was asleep upstairs. When Westley and G.B. returned to the apartment ten minutes later, they entered through the front door, which swung into the apartment partially blocking the view to the living room, and they walked through the dining room into the kitchen. A few minutes later, they called their children for breakfast, and although their sons came into the kitchen, A.W. did not. He said G.B. went to look for A.W., and then he saw G.B. take A.W. out the front door of the apartment and walk around by the pool. At the time, the Defendant repeatedly asked, "What did she say? What did she say?" When G.B. and A.W. returned to the apartment, G.B. told him that the Defendant had "touched" A.W.. Westley said he was "shocked" and helped G.B. take A.W. upstairs to talk to S.B. about what happened. Westley said that he, G.B., and S.B. went downstairs. S.B. asked the Defendant if he had touched A.W., and the Defendant replied, "Man, man." He also noticed that the Defendant began "cleaning up" and "fidgeting[,]" even though the Defendant normally played video games. Then G.B. told the Defendant, "I know you did it because you [are] acting weird," and the Defendant got mad at her. Westley told G.B. to go upstairs, and the Defendant tried to run after G.B. so he could fight her, and he and the Defendant "start[ed] scuffling." The Defendant left, and Westley went upstairs, and when the Defendant returned and tried to come upstairs a few minutes later, G.B. threw a remote at

- 4 -

the Defendant, which hit him in the nose and made him bleed. Then the Defendant got a "2 x 4" board and acted like he was going to hit G.B. with it just as the police arrived at the apartment. He said the police had to draw their guns before the Defendant finally put the board down and was placed in handcuffs. Westley said that since this incident, A.W. has acted differently, and he has tried to keep A.W. busy with activities so she wouldn't "have to think about" what happened.

Timmy Mitchell, an officer with the Organized Crime Unit of the Memphis Police Department, testified that on September 7, 2015, he responded to a domestic violence call at S.B.'s apartment. When he arrived, he noticed that the front door to S.B.'s apartment was open and that the Defendant was holding a "2 x 4" board. Another officer on the scene told the Defendant to put the board down, so he would not have to hurt him, and the Defendant eventually put the board down and was detained. Although the Defendant had blood on his face, he refused to go to the hospital. Officer Mitchell entered the apartment and saw that G.B. was "very upset" and "angry." G.B. told Officer Mitchell and the other officers that she had "walked in" and "[the Defendant] had [A.W.'s] legs open and was trying to penetrate her" or "had penetrated her." Upon hearing this, Officer Mitchell detained everyone in the apartment. He spoke to Westley, who stated that he had held the Defendant down until the police arrived. Officer Mitchell noted that S.B., the Defendant's mother, "was more concerned about the [D]efendant than she was [A.W.]" and was "more worried about us hurting [the Defendant]." He said no one at the scene told him that the Defendant had confessed to touching A.W. inappropriately.

Jason Parish, an officer with the Crime Scene Investigation Unit of the Memphis Police Department, testified that he responded to S.B.'s apartment on September 7, 2015 to document, collect, and preserve evidence. In addition to taking numerous photographs of the scene, Officer Parish collected a "2 x 4" board and A.W.'s underwear.

James Byars, a Sergeant with the Child Abuse Sex Crimes Unit of the Memphis Police Department, testified that he responded to the Rape Crisis Center, where he spoke with G.B. and A.W. before A.W. had her forensic examination. Sergeant Byars stated that he and Sergeant Lee spoke to A.W. outside the presence of her mother. When Sergeant Byars asked A.W. what happened to her, A.W. replied that the Defendant "had put his front TT in her TT and booty and it hurt." A.W. also told him that the Defendant had pulled her clothes down when these offenses occurred. Sergeant Byars said that he was the first officer to talk to A.W. about what happened. He said that he was unable to take a statement from the suspect and that he relied on the statement G.B. had given to the Department of Children's Services about what she observed.

Nina Sublette, a licensed family nurse practitioner and an expert in the fields of sexual assault nursing examination and advanced practice nursing, testified that she

examined A.W. on September 7, 2015 at the Rape Crisis Center. Sublette said that because A.W. came to the center within four hours of the offenses, she was able to collect evidence for the rape kit during the examination. She also talked to A.W. outside the presence of her mother. When Sublette asked about what happened, A.W. said that the Defendant had "touched [her] TT with his TT." She said A.W. was "cooperative" and "quiet" when they talked. Sublette then conducted a forensic examination of A.W. and collected buccal swabs from A.W. as well as swabs from A.W.'s vulva and anus for the rape kit. She explained that for children who are premenstrual, she does not take a swab from the vaginal canal because the lack of estrogen in the body can make doing so painful. Sublette stated that A.W. was not wearing underwear when she arrived as the center, but she collected A.W.'s leggings. Sublette observed no physical injuries to A.W.; however, she said that "[d]epending on the type of assault and the type of object used, you may, or may not see injury." She added that in the "majority" of child victim cases, there is no injury, even if penile penetration has occurred, because of how the body naturally responds. Sublette said that based on her examination of A.W., she "could not say whether she was penetrated, or not." She noted that A.W. did not indicate that anything was hurting her at the time of the examination. Sublette later collected samples from the Defendant for the suspect kit.

Teresa Onry, a forensic interviewer for the Child Advocacy Center, testified that she conducted the forensic interview of A.W. on September 11, 2015. During this interview, A.W. said she lived with her mother and grandmother and that her uncle, the Defendant, was in jail because he was "so bad." She said that the Defendant took her pants and underwear off and "tried to get on [her]" and actually did get on her at her grandmother's home. During this interview, Onry showed A.W. illustrations of a female and male body, and A.W. identified the vagina as "TT," the penis as "TT", and the buttocks as "butt" or "booty[.]" A.W. told Onry that the Defendant's "TT" touched the inside of her "TT" and that it hurt. A.W. also told her that the Defendant's "TT" touched the inside of her "butt" and it "hurt." She said she was lying on the red couch downstairs in her grandmother's apartment when the Defendant touched her. A.W. asserted that the Defendant put his "TT" in her "TT" "a lot" and that the Defendant was the only person to put his "TT" in her "TT."

Christie Smith, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation and an expert in the fields of forensic biology and deoxyriboneculeic acid (DNA) analysis, testified that she tested the rape kit containing the buccal, vulvar and anal swabs from A.W., and A.W.'s pants and underwear, as well as the suspect kit containing buccal and penile swabs from the Defendant. Special Agent Smith said that although she did not find any semen on A.W.'s buccal swab, anal swab, or the pants, A.W.'s vulvar swab tested positive for semen, and the pink underwear tested positive for sperm cells. She explained that on the vulvar swab, the only DNA profile she was able to

obtain was from A.W. On the underwear, the Defendant was excluded from the sperm fraction in the DNA profile; however, the non-sperm fraction in the DNA profile was consistent with a mixture of two people, but because of the limited DNA profile obtained, her interpretation of this profile was inconclusive. When she conducted DNA testing on the penile swabs, the result was a mixture of DNA from at least two people but due to the limited profile, her interpretation of this profile was also inconclusive.

Special Agent Smith said she was asked to do further YSTR DNA testing on the vulvar swab that targets only male DNA. After testing the sperm fraction from the vulvar swab, she was only able to obtain a partial DNA profile that was inconclusive for comparison purposes, which meant that she was unable to include or exclude the Defendant. However, when she conducted YSTR DNA testing on the non-sperm fraction of the vulvar swab, she was able to develop a single source YSTR DNA profile that matched the Defendant's known DNA from his buccal swab.

Special Agent Smith said that while she was able to detect semen on the vulvar swab, she was unable to tell who caused that semen to be there because the only DNA profile she was able to obtain was consistent with the profile of A.W., the victim. In addition, she said that although the underwear contained a limited amount of sperm cells, the Defendant was excluded from the sperm fraction and the DNA profile for the non-sperm fraction was so limited that she was unable to conclusively identify to whom it belonged.

Special Agent Smith said that occasionally there is DNA in the non-sperm fraction that is from the sperm fraction, and vice versa. She reiterated that on the non- sperm fraction from the vulvar swabs, she was able to obtain a full YSTR DNA profile that matched the Defendant's profile. She acknowledged that she was unable to tell the jury when the Defendant's DNA was left or how it was transferred or deposited on the vulvar sample.

S.B., who testified for the defense, stated that the Defendant was her son, G.B. was her daughter, and A.W. was her granddaughter. On the morning of September 7, 2015, S.B. awoke when she heard G.B. screaming that the Defendant had done "something" to A.W. S.B. walked downstairs and asked the Defendant if he had done "something" to A.W, and the Defendant replied, "No." At the time, neither the Defendant's nor A.W.'s clothes were in disarray. Then G.B. began fighting with the Defendant inside the apartment, and G.B. threw something at the Defendant, which caused him to bleed. S.B. said Westley did not participate in the fight and only held G.B. back from the Defendant. She also said that A.W.'s underwear was not on her bedroom floor when she went downstairs to talk to the Defendant and that she first noticed the underwear when she came back upstairs after talking to the police.

S.B. acknowledged that she never saw the offenses involved in this case because she was in her bedroom upstairs at the time they occurred. She denied telling G.B. that this was a family problem that should stay in the family. She also denied telling G.B. that she should not call the police. S.B. admitted that she had a prior conviction for theft of property.

On rebuttal, G.B. testified that approximately one month prior to trial, S.B. told her that she should not have called the police because the Defendant "just need[ed] help." G.B. said that two days after the Defendant's arrest, S.B. made her and her family leave her home. She said that in the last two years while this case was pending, S.B. never asked her how A.W. was doing.

At the conclusion of trial, the jury convicted the Defendant as charged. Following a sentencing hearing, the trial court imposed concurrent sentences of forty years for the rape of a child conviction and ten years for the aggravated sexual battery conviction, for an effective sentence of forty years in confinement.

Thereafter, the Defendant filed a timely motion for new trial, which was denied on April 16, 2018. On October 29, 2018, the Defendant filed a motion seeking to late-file his notice of appeal, and this court found that it was appropriate in the interest of justice to waive the timely filing of the Defendant's notice of appeal. The Defendant filed his notice of appeal on December 10, 2018.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant contends that the trial court erred in denying his motion for judgment of acquittal and that the evidence is insufficient to sustain his convictions for rape of a child and aggravated sexual battery. The State responds that the evidence, when viewed in the light most favorable to the prosecution, is more than sufficient for a rational juror to find the Defendant guilty as charged. After evaluating the evidence presented at trial, we conclude that the trial court did not err in denying the motion for judgment of acquittal and that the evidence is sufficient to support both of the Defendant's convictions.

When considering a motion for judgment of acquittal, whether at the close of the State's proof or after the conclusion of all proof at trial, the trial court is only concerned with the legal sufficiency of the evidence and not with the weight of the evidence. State v. Collier, 411 S.W.3d 886, 892 (Tenn. 2013) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983); State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995)). If a defendant chooses to present proof after the trial court denies the motion for judgment of acquittal

made at the close of the State's case-in-chief, then he "waive[s] any claim of error for failure to grant the motion for judgment of acquittal at the conclusion of the proof offered by the State." Id. at 893 (emphasis omitted). However, if the defendant renews his motion for judgment of acquittal at the conclusion of all the evidence, as the Defendant did in this case, he does not "waive his right to appeal the denial of the motion made at the close of all of the proof or to challenge the sufficiency of the convicting evidence." Id. (emphasis omitted). When a motion for judgment of acquittal is made at the close of all the proof, the trial court must favor the party opposing the motion with the strongest legitimate view of the evidence, including all reasonable inferences from the evidence, and cast aside any countervailing evidence. Id. (citing State v. James, 315 S.W.3d 440, 455 (Tenn. 2010)). We recognize that "[t]he standard by which the trial court determines a motion for judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[.]" Id. (citing State v. Little, 402 S.W.3d 202, 211 (Tenn. 2013)); see State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

Accordingly, we must consider "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." Hanson, 279 S.W.3d at 275 (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).

**A. Rape of a Child.** The Defendant contends that there are several reasons why the evidence is insufficient to support his rape of a child conviction. He argues that "[t]here was no evidence on the alleged scene that would support that a rape occurred."

He asserts that there were no witnesses who saw him assaulting A.W. and that he had his pants on when he was first observed by G.B. He also claims that neither G.B. nor Westley "noticed anything unusual" when they returned home from the store and that S.B. "was upstairs and heard nothing." Moreover, he maintains that no one mentioned prior to trial that this incident allegedly occurred beside the couch and that no evidence was ever collected from the couch or the area near the couch to show that he sexually abused A.W. The Defendant maintains that there was no proof showing that A.W. was in distress from being penetrated by a twenty-four-year-old male. He references Officer Byars testimony that A.W. was not "crying or upset" and appeared "normal" and Nina Sublette's testimony that she found no injuries to A.W. and that A.W. told her there was nothing hurting her at the time of the examination. The Defendant additionally claims that there was no physical evidence showing that A.W. was penetrated because the forensic examination performed by Sublette did not include collecting DNA from inside A.W.'s vagina.

The Defendant also contends that the first DNA tests performed by Special Agent Smith were inconclusive and that after conducting YSTR DNA testing, Special Agent Smith found a mixture of his DNA and another male's DNA on the non-sperm fraction, which could be explained by the fact that A.W. "lived in the house with two males[,]" who all "shared household furniture and common bathrooms." He further asserts that he never confessed to having sexual contact with A.W., despite G.B.'s insistence that he admitted to these allegations. The Defendant contends that neither he nor G.B., S.B., or Westley gave a formal statement to the police regarding the allegations. The Defendant argues that A.W.'s testimony at trial "raises grave concerns about her credibility and ability to factually recall things." He specifically claims that at trial, A.W. could not spell her name, could not recall the day that the alleged incident occurred, did not know how she got to court, and admitted that her mother told her what to say. The Defendant argues that G.B. provided inconsistent and unreliable statements regarding the alleged incident. In particular, he states that although Officer Mitchell testified that G.B. told him that the Defendant had A.W.'s legs open and was trying to penetrate her, G.B.'s testified that she never made these statements to Officer Mitchell and that she found A.W., with her underwear down by her ankle and her pants up, behind the couch with the Defendant.

Rape of a child, a Class A felony, is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7). At trial, for the rape of a

child count, the State elected to proceed with the Defendant's act of penetrating A.W.'s vagina with his penis.

The Defendant contends that the evidence is insufficient to sustain his convictions because there was no proof at the scene to show that a rape occurred, because none of the adults at the scene gave a formal statement to police, and because he never confessed to sexually abusing A.W. The evidence presented at trial showed that when G.B. realized that A.W., who was five years old, had not come into the kitchen to eat breakfast, she walked into the living room to look for her and saw the Defendant, whose pants were "twisted," get up from the floor with a surprised look on his face. G.B. also saw A.W., who did not have her pants on and who looked shocked "like she was in trouble or something," get up from the floor. She then observed the Defendant hurrying to get A.W.'s pants on. As G.B. assisted A.W. in pulling up her pants, she saw that A.W.'s underwear was at her ankle. Although the Defendant claimed that he was helping change A.W.'s clothes because she had urinated on herself, he could not explain where her wet clothes were, and there were no other signs that A.W. had urinated on herself.

G.B. said she later discovered that A.W.'s underwear had "a streak of discharge" on it, but the underwear did not feel damp like A.W. had urinated on it, and it did not smell like urine. When G.B. asked A.W. what happened, A.W. immediately disclosed that the Defendant had touched her. During this time, the Defendant repeatedly asked what A.W. was telling G.B.[256]. When G.B. and A.W. went back inside the home, G.B. told Westley and S.B. that the Defendant had touched A.W., and when S.B. asked the Defendant if he had done this, the Defendant replied, "Man[,] and "got real[ly] sad" but never denied touching A.W. When S.B. asked the Defendant why he would do this to his niece, the Defendant became angry and tried to attack G.B..

A.W., who referred to the body parts of vagina and penis as "TT," testified that the Defendant took off her pants and underwear, touched her "TT" with his hand, and touched her "TT" with his "TT" while his pants and underwear were pulled down. She said the Defendant's "TT" looked hard when he touched her with it and that the Defendant put his "TT" inside of her "TT" because it hurt. A.W. also said that the Defendant touched her "butt" with his "TT." Sergeant Byars testified that A.W. told him that the Defendant "put his front TT in her TT and booty and it hurt." Nina Sublette testified that during the forensic examination at the Rape Crisis Center, A.W. said that the Defendant had "touched [her] TT with his TT." Teresa Onry testified that A.W. told her that the Defendant's "TT" touched the inside of her "TT" and that it hurt and that the Defendant's "TT" touched the inside of her "butt[,]" which also hurt." Special Agent Smith testified that when she conducted YSTR DNA testing on the non-sperm fraction of the vulvar swab, she was able to develop a single source YSTR DNA profile that matched the Defendant's known DNA profile from his buccal swab.

While the Defendant asserts that there was no physical evidence showing penetration because the forensic examination did not collect DNA from the inside of A.W.'s vagina, Nina Sublette explained that she never obtains a swab from the vaginal canal of children because it can be painful. As to this issue, we note that the State did present physical evidence supporting the rape of a child charge—namely the single source YSTR DNA profile from the non-sperm fraction found on the vulvar swab, which matched the Defendant's known DNA profile. Accordingly, this DNA evidence, when combined with the other proof presented at trial, was sufficient for a rational jury to conclude that the Defendant vaginally raped A.W.

The Defendant also challenges the credibility G.B's and A.W.'s testimony. G.B.'s testimony included innumerable details about what she observed when she first encountered the Defendant with A.W. on September 7, 2015. In addition, A.W. provided detailed testimony that the Defendant put his "TT" inside her "TT" and that the Defendant touched her "butt" with his "TT." She provided consistent statements regarding this abuse to G.B., Sergeant Byars, Nina Sublette at the Rape Crisis Center, and Teresa Onry at the Child Advocacy Center. We cannot overemphasize that it is the jury's prerogative to evaluate the credibility of all witnesses, including the victim. See Campbell, 245 S.W.3d at 335. The jury, by its verdict, accredited the testimony provided by G.B. and A.W., and we will not disturb the jury's determination regarding the credibility of witnesses and the weight given to this evidence.

Lastly, the Defendant asserts that the evidence is insufficient to sustain his rape of a child conviction because there was no proof showing that A.W., who was five years old at the time of these offenses, was in distress from being penetrated. Nina Sublette testified that although she observed no physical injuries to A.W., she said that "[d]epending on the type of assault and the type of object used, you may, or may not see injury." Sublette also stated that in the "majority" of child victim cases, there will be no injury, even if penile penetration has occurred, because of how the body natural responds. In light of the overwhelming evidence of his guilt, the Defendant has failed to show that the evidence is insufficient to sustain his conviction on this basis. Because a rational jury could have found the Defendant guilty of rape of a child beyond a reasonable doubt based on the evidence presented at trial, the Defendant is not entitled to relief on this issue.

**B. Aggravated Sexual Battery.** The Defendant also contends that the evidence is insufficient to sustain his conviction for aggravated sexual battery. However, instead of providing specific argument as to why the evidence is insufficient as to this conviction, the Defendant merely asserts that "the facts argued for the conviction of rape of a child also apply to the conviction for aggravated sexual battery." In response, the State asserts that the Defendant has waived this issue for failing to support it with argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to

authorities, or appropriate references to the record will be treated as waived in this court."). While we agree that the Defendant risked waiving this issue by failing to clearly support it with argument, we will nevertheless address this issue on its merits.

Aggravated sexual battery, a Class B felony, is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). Sexual contact includes "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6). Intimate parts includes "semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2). At trial, for the aggravated sexual battery count, the State elected to proceed with the Defendant's act of putting his penis in or on A.W.'s butt or anus.

A.W. testified that the Defendant touched her "butt" with his "TT." Sergeant Byars testified that A.W. told him that the Defendant "put his front TT in her TT and booty and it hurt." In addition, Teresa Onry testified that A.W. said the Defendant's TT touched the inside of her "butt" and it "hurt." The evidence presented at trial showed that the Defendant removed his and A.W.'s clothes behind the couch. Upon being discovered, the Defendant repeatedly asked what A.W. had told G.B. about what had happened and later tried to attack G.B. after she disclosed what A.W. had told her about the Defendant's abuse.

Given this evidence, a rational jury could have found that the Defendant intentionally touched A.W.'s buttock, an intimate part, with his penis and that this touching was for the purpose of the Defendant's sexual arousal or gratification. We reiterate that all questions regarding a victim's credibility and the weight to be given to this testimony are determined by the jury, not this court. Here, the jury clearly accredited the testimony of A.W. and the rest of the State's witnesses. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for aggravated sexual battery.

**II. Sentence.** The Defendant also argues that the trial court erred in applying enhancement factor (1), that he had a previous history of criminal behavior, to both of his convictions based on G.B.'s testimony at the sentencing hearing that he anally raped her when she was a child. See id. § 40-35-114(1). The Defendant claims that the trial court should not have applied this enhancement factor because he had "no convictions" to substantiate G.B.'s allegation, because there were "no official documents" verifying G.B.'s allegations that he raped her, and because the affidavit of complaint referenced by the State contained no determination that he committed the alleged acts. The Defendant

insists his "history supported no more than a 25[-]year sentence for rape of a child." The State responds that the trial court did not err in applying this enhancement factor, but that even if it did, the Defendant's sentences should be affirmed because the application of enhancement factors is merely advisory. We conclude that the trial court did not abuse its discretion in applying this enhancement factor or in sentencing the Defendant to an effective forty-year sentence.

At the Defendant's sentencing hearing, the State entered the presentence report and A.W.'s and G.B.'s victim impact statements as exhibits. G.B. also read her victim impact statement into the record. She stated that following these offenses, A.W. was shyer than she had been before and often told strangers that the Defendant had raped her as a way for her to process what happened. A.W. had also fallen behind in school, although her teachers and counselors had been helping her. G.B. revealed that when she was five years old, the Defendant had done "the same thing to [her,]" but "there was never any justice[.]" She said she hoped that A.W. would get the justice that she needed and deserved. G.B. also said that the Defendant had "ruin[ed] her life" and had "tried to ruin [her] baby's life[,]" but had not "succeed[ed]."

The presentence report in this case notes that the Defendant admitted "he was brought into the Department of Children Services (DCS) at the age of 12 because his biological sister [G.B.] (age 9) accused him of rape." The report states that the officer writing the report then contacted the Franklin County Juvenile Court and learned that the court's records contained an affidavit of complaint, wherein S.B. "disclosed that her daughter, [G.B.] (age 9) had been sodomized by [the Defendant]." The record also states that G.B. had a forensic examination at the Franklin County Child Advocacy Center, where an employee "discovered that victim [G.B.'s] rectum muscle was nearly non-operational[,] indicating repeated anal penetration on several occasions," and that there was blood in her rectum. Thereafter, the Defendant was charged with thirteen counts of rape of a child based on the offenses he had committed against G.B. The report adds that on November 18, 2003, the Franklin County Juvenile Court determined that the Defendant "was not psychologically competent to stand trial" and that "placement/release would endanger his victim." The juvenile court later found that the Defendant was "dependent and neglected" and ordered the Defendant to remain in the custody of the Tennessee Department of Children's Services. Finally, the officer writing the presentence report assessed the Defendant and concluded that the Defendant's "overall risk" was "high violent."

At the conclusion of the sentencing hearing, the trial court applied enhancement factor (1), that the Defendant had a previous history of criminal behavior. See id. § 40-35-114(1). The court stated that it was appropriate to apply factor (1) to both convictions because the Defendant's sexual abuse of G.B. had been "documented" and had been

- 14 -

testified to by G.B. The court also applied enhancement factor (7), that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, to the rape of a child conviction. See id. § 40-35-114(7). It found that there were no mitigating factors that applied in this case. Before imposing the sentence in this case, the court then made the following statement:

> [T]his is one of the most horrific acts and events that I've seen in terms of a child. I'm taking into consideration the victim impact statement. . . . I will note that [the victim is] present in the courtroom. I will note that I do remember her testimony. I do also take note of the mother, the victim impact statement [from her].
>
> It seems that this is one of those cases that, somehow or another, prior behavior of the same nature has kind of slipped through the cracks. And there is no other conviction [for this criminal behavior], but that I can't concern myself with. There's enough evidence in this case. The jury came back with a unanimous verdict that he was guilty of rape of a child and aggravated sexual battery.

The trial court then sentenced the Defendant as a Range I, standard offender to concurrent, within-range sentences of forty years at one hundred percent for the rape of a child conviction and ten years at one hundred percent for the aggravated sexual battery conviction. See Tenn. Code Ann. §§ 39-13-504(b), -522(b)(1), (b)(2)(A), 40-35-112(a)(1), (2), -501(i).

We note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The amendments to the sentencing act also "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1)     The evidence, if any, received at the trial and the sentencing hearing;
(2)     The presentence report;
(3)     The principles of sentencing and arguments as to sentencing alternatives;
(4)     The nature and characteristics of the criminal conduct involved;
(5)     Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6)     Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
(7)     Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and
(8)     The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).  The defendant has the burden of showing the impropriety of the sentence on appeal.  Id. § 40-35-401, Sentencing Comm'n Cmts.  The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]"  Id. § 40-35-102(1).  The court must consider the defendant's potential for rehabilitation or treatment.  Id. §§ 40-35-102, -103.  In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Id. §§ 40-35-103(2), (4).

The Defendant argues that the trial court erred in applying enhancement factor (1) based on G.B.'s testimony that the Defendant raped her when she was a child.  Initially, we note that facts relevant to sentencing must be proven only by a preponderance of the evidence.  State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000).  This court has held that a trial court may find evidence of criminal behavior "regardless of whether it resulted in arrest, indictment, or conviction[.]"  State v. Massey, 757 S.W.2d 350, 352 (Tenn. Crim. App. 1988).  Moreover, "enhancement is permissible when the episodes of criminal behavior are established by the testimony of witnesses."  State v. Anthony Joel Allen, Jr., No. 01C01-9612-CC-00514, 1998 WL 235963, at *4 (Tenn. Crim. App. May 7, 1998); see State v. Hunter, 926 S.W.2d 744, 749 (Tenn. Crim. App. 1995) (concluding that a victim's testimony concerning unindicted acts of sexual misconduct was sufficient to support application of the enhancement factor regarding the defendant's criminal behavior).  Accordingly, we conclude that G.B.'s testimony at the sentencing hearing provided sufficient evidence to support the application of this enhancement factor.

We also note that the presentence investigation report provided further evidence supporting the application of enhancement factor (1).  The report shows that the

- 16 -

Defendant admitted that G.B. had accused him of raping her when she was nine years old. The report relied on records from the Franklin County Juvenile Court, which provided information regarding the investigation into G.B.'s allegations and gave an explanation for why criminal charges in this case were never brought against the Defendant. We conclude that based upon G.B.'s testimony at the sentencing hearing and the contents of the presentence investigation report, the trial court properly applied enhancement factor (1) to both of the Defendant's convictions.

After reviewing the record, we additionally conclude that the trial court did not abuse its discretion in sentencing the Defendant to an effective forty-year sentence. The evidence presented, the nature of the criminal conduct involved, and the trial court's application of enhancement factors provide a sufficient basis for the trial court's imposition of concurrent, within-range sentences of forty years for the rape of a child conviction and ten years for the aggravated sexual battery conviction. Because the record establishes that the trial court properly considered the purposes and principles of sentencing as well as the applicable enhancement and mitigating factors, we uphold the Defendant's effective forty-year sentence.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE